TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-06-00328-CV






MFC Finance Company of Texas, Appellant


v.


Carole Keeton Strayhorn, Comptroller of Public Accounts of the State of Texas,

and Greg Abbott, Attorney General of the State of Texas, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT

NO. D-1-GN-00-002653, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 This is an appeal from a summary judgment in a tax refund suit to recover motor
vehicle sales tax with interest. The issue presented is whether a company that purchased installment-sales contracts from retail motor vehicle dealers could avail itself of the bad debt refund statute after
the obligors defaulted. We will affirm the district court's judgment.


BACKGROUND MFC Finance Company of Texas, a subsidiary of Mercury Finance Company, was
in the business of buying installment-sales agreements from motor vehicle dealers. Sixteen thousand
such contracts purchased by MFC are at issue in this case. Under each of these contracts, the motor
vehicle purchasers made down payments and/or trade-ins and agreed to pay the dealer the remainder
of the purchase price, plus interest, fees, and sales tax, in installments over periods ranging from
3 to 48 months. The dealers retained liens on the vehicles. Each installment payment included,
among other components, a portion of the principal amount owed on the debt, as well as the sales
tax owed on the purchase price.

 Upon receipt of each installment payment, the dealers were then obligated to remit
the sales tax amount to the comptroller. (1) See Tex. Tax Code Ann. § 152.047(e) (West Supp. 2007). (2) 
However, the tax code provides that if the dealer assigns or transfers its right to payments under a
contract, it is then required to pay in full the total amount of sales tax remaining due on the sale of
the vehicle. See id. § 152.047(g) (West Supp. 2007). When purchasing the installment-sales
agreements, MFC would pay each dealer a lump-sum amount reflecting the value of future payments
(including the principal, interest, and sales tax components) discounted for the risk MFC
assumed--that the obligor would default. In exchange, the dealer assigned its rights, title, and
interest in the contract to MFC.

 Under each of the sixteen thousand installment contracts at issue here, the obligor
defaulted. The vehicles were repossessed and sold, and the unpaid portion that remained after
the resale, including the corresponding portion of the motor vehicle tax owed, was entered
as bad debt on MFC's books and reported as a loss on MFC's federal income tax returns from
1996 through 1999.

 In March 1999, MFC filed a refund claim with the comptroller for sales
taxes paid but never collected. See Act of May 6, 1983, 68th Leg., R.S., ch. 235, art. 7, § 6, 1983
Tex. Gen. Laws 983, 1043-44 (amended 1999) (current version at Tex. Tax Code Ann. § 151.426(c)
(West 2002)). The total refund requested for all tax years at issue was $4,726,696.19. The
comptroller denied MFC's refund claim. After timely filing its motion for rehearing with the
comptroller, the comptroller denied MFC's motions, and MFC appealed to the district court. The
parties filed cross motions for summary judgment. In its motion for summary judgment, MFC
argued that it was entitled to a refund of the motor vehicle sales tax under the tax code's bad debt
statute, while the comptroller argued that MFC has no statutory right to a refund. In addition to the
parties' statutory construction issues, the comptroller's motion included a no-evidence ground. The
comptroller argued that there was no evidence that the dealers qualified as seller-financiers under
the tax code or that the dealers had remitted the tax to the comptroller. Without specifying the
grounds, the district court granted the comptroller's summary judgment and denied MFC's motion
for partial summary judgment. MFC appeals.


DISCUSSION

Standard of review

 When the parties file cross-motions for summary judgment and the trial court
grants one motion and denies the other, an appellate court should review the summary judgment
evidence supporting each motion and determine all questions presented. FM Props. Operating Co.
v. City of Austin, 22 S.W.3d 868, 872 (Tex. 2000). The appellate court "should render the judgment
that the trial court should have rendered." Id. If the trial court's order does not specify the grounds
upon which it granted summary judgment, the appellate court "must affirm summary judgment if
any of the summary judgment grounds are meritorious." Id.

 The issues in this case turn principally on statutory construction. Statutory
construction presents a question of law that we review de novo. State v. Shumake, 199 S.W.3d 279,
284 (Tex. 2006). We seek to discern the legislature's intent, as manifested first and foremost in the
statutory text. Id. We ascertain the legislature's intent from the plain meaning of the words chosen
when possible. Id. To that end, we consider statutory language in context, not in isolation. Jones
v. Fowler, 969 S.W.2d 429, 432 (Tex. 1988); see Tex. Gov't Code Ann. § 311.011(a) (West 2005).
Statutes are to be read as a whole and interpreted to give effect to every part. City of San Antonio
v. City of Boerne, 111 S.W.3d 22, 26 (Tex. 2003). We also presume that the legislature acted with
knowledge of the background law. Acker v. Texas Water Comm'n, 790 S.W.2d 299, 301
(Tex. 1990). Words and phrases that have acquired a technical or particular meaning shall be
construed accordingly. Tex. Gov't Code Ann. § 311.011(b). When ascertaining legislative intent,
we may also consider the objective of the law, its history, and the consequences of a particular
construction. Id.; see also id. § 311.023(1), (3), (5) (West 2005).


Applicability of the bad debt refund statute

 MFC argues that because a portion of the total sales tax due on the installment
sales in question was included as a component of each installment payment, a portion of MFC's
purchase price paid to the dealers from which MFC purchased the installment contract
reflected anticipated sales tax collections under the contract, and MFC is entitled to a refund of
any portion of this amount that it did not collect from the obligors under each contract. It relies on
the bad debt refund statute, which is found in chapter 151 of the tax code, the code's general sales
tax chapter. At relevant times, it provided:


 (c) A retailer is entitled to credit or reimbursement for taxes paid on the
portion of:

 

 (1) an account determined to be worthless and actually charged off for
federal income tax purposes; or

 

 (2) the remaining unpaid sales price of a taxable item when the item is
repossessed under a conditional sales contract.


art. 7, § 6, 1983 Tex. Gen. Laws at 1043-44. The comptroller argues--and MFC does not
dispute--that MFC is not a "retailer" under chapter 151 of the tax code and the bad debt refund
statute. See Tex. Tax Code Ann. § 151.008(a) (West 2002) (defining a "seller" or "retailer" as "a
person engaged in the business of making sales of taxable items of a kind the receipts from the sale
of which are included in the measure of the sales or use tax imposed by this chapter"). It is also
undisputed that MFC did not itself remit sales tax to the comptroller. Instead, MFC asserts that it
can claim the bad debt refund as an assignee of the motor vehicle retailers or dealers who originally
executed the installment sales contracts. The comptroller responds that because the motor vehicle
dealers never had or could have a right to a bad debt refund, they had no such right to assign to MFC. 
MFC replies that (1) the dealers qualify as "seller-financiers" under chapter 152 of the tax code;
(2) chapter 152's provisions governing seller-financiers incorporate the bad debt provision from
chapter 151 so as to entitle seller-financiers to refunds under the bad debt statute; and (3) under
common-law principles, the motor vehicle dealers could assign their bad debt refund rights to MFC.

 Assuming without deciding that, as MFC contends, the motor-vehicle dealers qualify
as "seller-financiers," (3) MFC's theory hinges on the following provision of chapter 152:


 Collection of Tax on Seller-Financed Sale

 

 (a) Except as inconsistent with this chapter and rules adopted under this chapter,
the seller of a motor vehicle shall report and pay the tax imposed on a seller-financed sale to the comptroller on the seller's receipts from seller-financed
sales in the same manner as the sales tax is reported and paid by a retailer
under Chapter 151.


See Act of April 6, 1993, 73rd Leg., R.S., ch. 29, § 4, 1993 Tex. Gen. Laws 66, 66-67
(amended 2007) (current version at Tex. Tax Code Ann. § 152.047(a) (West Supp. 2007)). 
MFC urges that this provision incorporates chapter 151's bad debt refund provision because there
is no bad debt refund provision in chapter 152 with which section 151.426 would be "inconsistent."
However, the comptroller points to other provisions of chapter 152 that are inconsistent with the
existence of a claim by a seller-financier for a bad debt refund.

 The tax code requires the seller of a motor vehicle to report and pay to the comptroller
motor vehicle sales tax on a seller-financed sale. Id. The seller need only remit these taxes as the
proceeds of the sale are received. Tex. Tax Code Ann. § 152.047(e). This statutory framework, as
the comptroller observes, is inconsistent with the possibility of a bad debt refund claim. Because
the seller is required to remit motor vehicle taxes only as proceeds are received, it would not pay
sales taxes that it had not collected and that might later become the basis for a bad debt refund claim.
Chapter 152, in other words, contemplates that if proceeds are not received, taxes are not paid.

 Only if the seller assigns or transfers its right to receive payment does all sales tax
become due immediately. Id. § 152.047(g). When the seller receives payment for transfer of its
right to payment, it is required to remit all taxes due on the vehicle at that time. Even in this
situation, however, no right to a bad debt refund arises because the seller remits taxes only after
assigning and being paid for his right to receive future payments.

 Here, the dealers typically sold their rights to receive payment to MFC at a five to ten
percent discount. In return, MFC assumed the risk that purchasers would ultimately be unable to
make payment on the contracts. Those payments represented not only sales proceeds but also sales
taxes. The discounted price MFC paid reflected the risk that these payments might not occur. 
MFC's claim in effect seeks compensation for a loss for which it assumed the risk in its transactions
with motor vehicle dealers.

 MFC also emphasizes that motor vehicle lessors are entitled to bad debt refunds under
a statute similar to the tax code provision governing seller-financiers. As noted, section 152.047(a)
of the tax code, governing seller-financiers, provides:


 Except as inconsistent with this chapter and rules adopted under this chapter, the
seller of a motor vehicle shall report and pay the tax imposed on a seller-financed
sale to the comptroller on the seller's receipts from seller-financed sales in the same
manner as the sales tax is reported and paid by a retailer under Chapter 151.


§ 4, 1993 Tex. Gen. Laws at 66-67. Section 152.045(a) of the tax code, governing motor vehicle
lessors, similarly provides:

 Except as inconsistent with this chapter and rules adopted under this chapter, an
owner of a motor vehicle subject to the tax on gross rental receipts shall report and
pay the tax to the comptroller in the same manner as the Limited Sales, Excise and
Use Tax is reported and paid by retailers under Chapter 151 of this code.


Tex. Tax Code Ann. § 152.045(a) (West 2002). The comptroller's rule accompanying section
152.045 states:


 A retailer who has previously paid motor vehicle gross rental receipts tax may take
a deduction or seek a credit for the tax paid on the gross rental receipts that are
determined uncollectible if the uncollectible amount is entered on the retailer's books
as a bad debt and claimed as a deduction for federal income tax purposes.


34 Tex. Admin. Code § 3.78(c)(1)(B) (West 1996). The comptroller has not adopted a similar rule
as to seller-financiers.

 MFC urges that because of the textual similarities between sections 152.045(a) and
152.047(a), the comptroller is required to interpret the two provisions in the same way and permit
seller-financiers to take a bad debt deduction for the sales taxes paid on installments payments that
become uncollectible. However, we are required to consider sections 152.045(a) and 152.047(a) not
in isolation, but in context with the statutory scheme as a whole. City of San Antonio, 111 S.W.3d
at 26. As explained above, the legislature has made seller-financiers responsible for reporting and
paying motor vehicle sales tax only as proceeds are received, a statutory scheme that does not
contemplate claims for bad debt refunds. Tex. Tax Code Ann. § 152.047(g). In contrast, the
legislature has required motor vehicle lessors to add the tax to its rental charge. Id. § 152.045. The
tax becomes "a part of the rental charge" and "a debt owed to the motor vehicle owner by the person
renting the vehicle." Id. Thus, the tax must be remitted by the lessor at the time the rental charge
is incurred, which is not necessarily at the same time that the lessor receives payment from the
lessee. Consequently, the legislature contemplated that a motor vehicle lessor, unlike a seller-financier, could pay sales tax on rentals yet ultimately not be able to recover the tax from the lessees. 
These differences in the statutes governing motor vehicle lessors versus seller-financiers support the
comptroller's different interpretations of what, in isolation, appears to be similar language in section
152.045 and 152.047. (4)

 Because the dealers have no claim to a bad debt refund under the tax code, no claim
can be assigned to MFC. See Gulf Ins. Co. v. Burns Motors, Inc., 22 S.W.3d 417, 420 (Tex. 2000)
(explaining that the assignee stands in the shoes of the assignor and may assert only those rights that
the assignor could assert). The district court did not err in granting summary judgment for the
comptroller on this ground and denying MFC's motion for partial summary judgment.


Other issues

 MFC argues that the comptroller's summary judgment arguments are based on
subsequent amendments to the tax code rather than the version that governs this case. The foregoing
analysis is based on the law in effect at the time MFC's refund claim arose. We accordingly need
not reach the parties' contentions regarding the implications of the subsequent amendments.

 MFC further asserts that the district court erred in granting the comptroller's no-evidence motion for summary judgment because MFC has produced some evidence that the dealers
were seller-financiers and that they remitted the tax to the comptroller. Because we have assumed
in our analysis that the dealers were seller-financiers and did remit sales taxes, we need not reach
these contentions.


CONCLUSION

 We affirm the judgment of the district court.



 __________________________________________

 Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop 

Affirmed

Filed: May 1, 2008
1. We substitute Susan Combs, in her official capacity, as successor to Carole Keeton
Strayhorn, Comptroller of Public Accounts of the State of Texas. See Tex. R. App. P. 7.
2. For convenience, where statutory language cited or referred to is unchanged, we will cite
to the current version of the statute.
3. See Act of April 6, 1993, 73rd Leg., R.S., ch. 29, § 4, 1993 Tex. Gen. Laws 66,
66-67 (amended 2007) (current version at Tex. Tax Code Ann. § 152.047(a) (West Supp. 2007));
Tex. Tax Code Ann. § 152.065 (West 2002) (requiring a seller-financier to hold a motor vehicle
sales tax permit issued by the comptroller).
4. In light of these differences in the statutory schemes governing motor vehicle sellers and
motor vehicle lessors, we likewise reject MFC's arguments based on "legislative acceptance" of the
comptroller's interpretation of section 152.045(a). We similarly conclude that the comptroller's
differing interpretations are neither unreasonable or unconstitutional.